Our last case for argument is 24-1342. How do I say the name of your client? Maggie Mae Technologies. We had a lot of different versions of that and that was never one of them. Say it again. Maggie Mae. Maggie Mae Technologies v. Phillips 66. If I recall correctly, it's a Beatles reference. Okay. It's a what? A Beatles reference. May it please the Court, Jamie McDole from Winstead on behalf of Appellant Maggie Mae Technologies. Your Honors, the District Court properly concluded that Phillips made relevant, improper, and prejudicial arguments on a core issue in the case. Whether the bulk physical properties of ISO 8217 could be measured through calculations and estimations as opposed to actual testing on samples. Samples that were never provided to Maggie Mae during fact discovery. But the District Court abused its discretion when it denied Maggie Mae's motion for a new trial. And that is because the District Court collapsed its harmless error analysis into sufficiency of the evidence. And as a result, made an incorrect decision with respect to the new trial. It's your position that the alternative grounds on which the jury could have relied, we don't, we cannot look at the record and figure out how the jury would have ruled on those, right? That is exactly correct, Your Honor. In fact, this was a general verdict. And so we only know that the jury concluded that there was no infringement. But what the District Court did is said, well, there is these two other positions that they had on non-infringement. One was merchantable quality, and one was on the prior to hydro processing. And we don't know. And we don't know. But what the judge did is weighed the evidence and decided, well, the jury could have done that. In fact, what the judge actually says in the end of his post-trial motion, which shows that he actually did sufficiency of the evidence. He said, because the parties presented conflicting evidence on the disputed issues from which the jury could have reasonably have concluded that Maggie Mae did not prove its claims by a preponderance of the evidence, the court will not disturb the jury's verdict by ordering a new trial. The language of jury could reasonably have. That means the jury reasonably could have not decided that. But we also know, we also know that the – What about, let me, let me just stop you for a second. If it's true, now, it's the opinion of the trial court says defendants presented undisputed evidence that the Bayway feed was not merchantable, right? Because the viscosity was too low. Now, if that was true, that it was undisputed that that claim limitation wasn't met, then you wouldn't be here making this argument, right? That's correct, Your Honor. If we had an insufficiency of proof, we offered no proof that we – that there was no infringement or that there was infringement on a particular claim element, that, I would agree, is harmless error. But that's not the only thing the judge said. He said that there was competing evidence because the evidence on the low viscosity related to a standard that – on merchantability, which – Wasn't that disputed, whether it was the standard or whether it was – I forget what it's called. It was called a flat's window. Yeah, thank you. And it was only for New York cargo. So imagine this a claim construction. This is a product claim. The barrel of oil comes off and it meets all of the limitations. So we should be able to determine infringement right there. But only in New York cargo do we decide whether the viscosity makes it merchantable. If we send it to Hong Kong from there, it's perfectly fine. So a product that is infringing coming off, we're making a – giving it a geographical limitation as to where it is because the flat's window is only for New York cargo. You're saying you're going to just – you're going to – you're losing me a little bit. But I think what you want to focus on is showing me why there's a factual dispute about why it's merchantable.  Your Honor, first of all – Where is that? Can you answer this question? We're sure we'll find out. Where is that dispute? Absolutely. So there were – it ended up at trial. I'm sorry. In the presence of answering it, could you also tell me – because it's confusing. Do you agree where the proper testing should take place, inside or outside the battery? Is there a dispute? There is absolutely a dispute, Your Honor. Okay. And that's why the actual testing matters. That is what – the term is prior to hydro-processing. There is no dispute that hydro-processing occurs when hydrogen is first put into the – Why don't you folks ask for a claim construction on that? There was no – it just seems so odd that you didn't have the judge construe. Did that mean outside the battery, inside the battery? I don't know. Somewhere else? Your Honor, I actually think prior to hydro-processing is a very simple term. You do? Right. But it doesn't say immediately prior to, nor does it say, you know – It doesn't. Any time prior to is what it could be, but nobody asked for a claim construction. Okay. But anyway, going back to disputed evidence, please, on the merchantable limitation, I would appreciate if you could identify that. So when we get to merchantability, a point – it only affects one of the claims on appeal. It's not dispositive of the appeal. Number two, there were competing claim constructions that went in. So there is a – there is a defined term. Merchantable quality is defined in the patent itself. It doesn't need a claim construction. It is defined. And what ended up happening is we said, well, we're going with that definition, and when that definition uses commercially sold, at the time of the invention, that means free of deleterious materials. And where does deleterious materials come from? Can you just answer just a quick question about where the factual dispute is prior to hydro-processing? The factual dispute prior to hydro-processing or prior for merchantability?  Sure. Merchantability prior to hydro-processing. And the Court walks through this in detail. But we put on evidence throughout the records, and the Court says in Appendix 99-102, explains the disputed claim construction relating to merchantable quality. And we put on evidence based on the express definition in the patent and why it was free of deleterious materials. The – and then what we had Phillips do is Phillips came in and said, well, that's not – So you're saying there's a claim construction issue. There is a claim construction issue, but it was – How was it resolved? It was not resolved. So – So you asked the district court judge to interpret this term? No, Your Honor. The parties argued what the plain and ordinary meaning was as – But as you're sitting here, you're saying you're relying on a definition and a specification. That's not plain and ordinary meaning. That's – we acted as our own lexicon for what – what Phillips came in. And to be honest with you, Your Honor, this happened right before trial. They came up with this argument. We did not know about the Platz window until the pretrial conference. And they came in and said, well, it has to meet the Platz window. And the Court viewed that as a factual dispute. And so the parties had competing factual plain and ordinary meanings and competing facts on which to apply the – apply to the plain and ordinary meaning. And we were perfectly happy going forward. Do you still think plain and ordinary meaning applies? I do think that we acted as our own lexographer, Your Honor. And it is – it is in the patent, and that is the definition that the patentee chose to have. But we offered evidence under that construction. And with respect to prior to hydro processing, prior to hydro processing can mean – it's just prior to hydro processing. Hydro processing, it's undisputed, is when hydrogen is put into the feedstock and becomes a mixture. Where? After drum 101. That is where hydrogen is added. There is a pump – and again, this is undisputed. There is a pump that increases pressure, adds hydrogen, and it goes into the reactor. Now, prior to hydro processing, I mean, Philips can take crude out of the ground and measure it if they'd like to. But that's not the purpose of the invention. Even during tech tutorials, the entire purpose – everyone explained it as, is what's going in, something is going in, something is reacted with a catalyst, and something comes out. The entire purpose of the claim is something goes in as ISO 287 compliant except for sulfur, and it's reacted, and it comes out. Pretty close to the same thing, except sulfur is lower. So it's a way to strip it without diminishing the rest of the properties. That's the entire purpose. And so there is a dispute on where to measure. But that is part of the issue, is when we get to that, we've said, no, we should be determining what it is right before it goes into the reactor. That's the purpose of this patent. And they've refused to give us that sample. And they told the district court at the time, well, we'll just – they can use estimates. They can use calculations. That's just fine. Don't make us do it because it's too expensive, and it's too dangerous for us to do. Now, that later out turned out not to be true. Those are two incorrect representations they made to the court. One, that they couldn't do it because it was too dangerous and too expensive because later, after fact discovery, they decided to do it. And two, that we could rely on estimates and calculations in order to get the information we needed. And then at trial, told us, well, as a matter of law, you have to have actual samples to test. Otherwise, you can't meet your burden. More important than telling you that at trial, they told the jury that, correct? Correct, Your Honor. Can I go back to the definition you're relying on for merchantable quality just for one minute? I take it you're relying on the 709 patent, column 8, lines 29 through 34, as being the lexicography express definition? Yes, I believe that is correct, Your Honor. I have it in the 884 patent. But, yes, it's in 709 as well for the continuation in part. So, yes, it's column 8, lines 29 through 34 in the 709 patent. And we offered evidence under that definition. And it was under the... It's hard because there's no claim construction on that term. But our evidence, I understand the court pointed to under their construction, based on the Platz information, which we contend cannot be correct because it didn't exist at the time of the invention. But we offered undisputed evidence under our construction. I understand, but this says it has to be able to be commercially sold. Correct. A residual marine fuel oil that should serve and could be commercially sold anyway. And at the time, there was no market for this to be sold. This was novel enough that before the standard came into place in 2020, our clients are the ones that figured out how are we going to meet that standard. The standard was identified, and it was not going to come into place. So what does commercially sold mean? If you look at ISO 28217, it actually has an addendum to it that talks about deleterious materials that says we don't want these in there. So we are trying to meet that specification. That's what this is all about. And so what does commercially sold mean? It means keeping it free of the deleterious materials. We're into your rebuttal time. Would you like to save it for the rest? Yes, Your Honor. Thank you very much. Unless you have a question, Your Honor. Go ahead, ma'am. Of course, of course. The jury term, the jury, it's not in the record, but I'm curious if it was asked. Were special interrogatories asked for the jury verdict? No, Your Honor. We are not permitted to question the jury afterwards. No, no, no. I don't mean that. On the verdict form. So it seems to me that had there been special interrogatories, what basis do you find infringement on? Because there were so many things going back and forth. Did you have a charge conference with the judge? Was it off the record? And at that time, did you ask for special interrogatories and the judge said no? Or did that never come up in this case? Your Honor, that never came up in this case. Because one of the issues is, the argument is, we simply just don't know how the jury got its verdict. That's correct. And you agree that if you had special interrogatories, we would know. That is correct. If we had special interrogatories, we would know better. Thank you. Okay. Thank you, Mr. McDole. Ms. Drake, please proceed. Good morning, Your Honors. May it please the Court, Denise Drake for Phillips 66. There are at least five easy and dispositive grounds for affirmance here before the Court should ever need to reach, dealing with the evidence in the first instance the way my friend on the other side would have this Court do. Number one, the plain error standard of review, which applies because if you look at the list on page 26 of Maggie May's brief, of the statements that they challenge on appeal, not a single one drew a contemporaneous objection. Maggie May never argues, and it essentially conceives, that it cannot meet the fourth prong of the plain error test. Wait a minute. They objected to the Court when Phillips got up and wanted to introduce, they wanted to introduce and ultimately did, that there was no testing done, that that would be impermissible. It seems to me the District Court at that time agreed with Phillips because I'm not so sure if it was because the magistrate judge was doing, the magistrate handled all the discovery matters, and the District Court allowed it to come in. Why didn't Phillips remind the Court that there had been a prior ruling where actual testing wouldn't come in, that the parties had agreed that they were going to rely upon these reality calculations? And why didn't Phillips stand up? It seems to me no one in the District Court was confused and say, well, Judge, in candor to the Court, that had previously been ruled out. Why? On the contrary, Your Honor, when this came up in the pretrial colloquy, the only thing that the District Court said is, I'm not going to keep it out on a preliminary basis, but Maggie May, you need to object when it comes up in the course of the evidence, so I can rule on it then, because this is just a preliminary ruling, inviting an objection when it came up at the time, and Maggie May thereafter. But seriously, by then the bell is unrung. The jury hears it. I mean, it just strikes me. Phillips knew this was not to come in. There was an agreement between the parties. This is how we're going to prove it. Because it was Phillips who said, it is too hot to test. It's too dangerous. We're not going to test. And then they did this change of course and say later on when they supplemented the summary judgment motion and said, well, we now have actual testing. And so they objected. And so this is how I'm hearing it. You're saying, well, we should have been permitted to infect the jury. We should have been permitted to say to the jury, they didn't do any testing. Then Maggie May is supposed to stand up and object, and now the bell, how do you unring that bell? Is that what you're saying? No, Your Honor. This is not an error of law or an incorrect legal theory that Maggie May, that Phillips 66 was putting to the jury. This is simply a discovery dispute that the judge kept the samples out because they were produced too late in the discovery process. And so the judge told the parties to see how it comes up in the course of the unfolding evidence. If you see a problem, you should object. And Maggie May never did. I see that in the record. Can you point to me where he said May contemporaneous objection? Yes, Your Honor. The district court did this twice, on page 1065 of the record and on page 846 of the record. One of those was in the context of the colloquy for the motion to non-serative instruction. I'm sorry. 1065 is way after he had already ruled erroneously. So it's way after. 1065. Because he, at 846, he says, Maggie May, I'm looking at 846. Maggie May says, please, don't let him do it. Don't let him do it. And the judge rules, well, I've read it. I'm going to allow it in. Okay. It seems to me clearly the court had not remembered that this evidence was not to come in. So where does he say, let's not talk about 1065, because that's way after. He's already filling it in. Where does he say, I'm going to reserve, just make contemporaneous objections. Where does he say that? He says, if you want to urge, if he offers evidence about this.  Well, I want to see it. 846, page 7, lines 18 through 21. If you want to urge, if he offers evidence about this, I'll hear it during trial. But at this preliminary stage, I'm not going to prohibit him referring to it in opening argument.  And thereafter. Okay, but hold on. Well, I just, I guess I'm just having a, I don't know if you want to call a duty of candor to the court. I'm just having an issue, because at that point, Phillips knew it wasn't to come in. You knew about the agreement that you had with Maggie May, which is that we're going to do, because you knew testing couldn't be done. It hadn't been done. And to inject this at the last minute just seems so prejudicial. Unless I'm totally missing something. I guess where I'm coming from is, how can Phillips really allow the judge to do this? It was clear, it seems clear to me. Look, I'm a trial judge. It seems clear to me. The trial judge didn't understand the procedural history, partly probably because the magistrate judge was doing most of the discovery. And that's common. But I just, you have to persuade me that somehow, Phillips wasn't playing a little fast and loose here. You're just going to have to persuade me. Two responses to that, Your Honor. Number one, the only thing that the parties had agreed and that the court ruled is that the samples themselves that conclusively showed no infringement here couldn't come in because they were produced too late. There had been no agreement between the parties, no ruling from the court about And no ruling from the parties. Way back at the very outset, they wanted samples at a particular point in the process. And you all convinced the magistrate that you should not have to give them those because it would be too expensive and too dangerous and because they could simply make their case by using formulas to prove it. Is that accurate or not accurate? May I just interrupt? There was a motion to compel. Yes, Your Honor. The reason that the samples weren't produced at the time is because at the time that Maggie May was asking for samples, which, by the way, it was asking for samples from 12 locations across the refinery, and at that time, Phillips 66 did not understand there to be and argued to the judge that there was no theory in the case that would make samples after D-101 relevant. It wasn't until Maggie May put in an expert report later in the case that raised this new theory that the D-101 drum could potentially change the flash point of the samples, that a sampling location after D-101 would bear on infringement at all. And so at the time when Maggie May said they don't – when Phillips 66 said they don't need this to prove infringement, it was because there was no theory in the case that would make that relevant. But you didn't just say you don't need it to prove infringement. You also said you can do it by calculation. You made that affirmative statement. And that is how it was argued at trial. No. Throughout trial, you argued they needed to do actual testing. They couldn't do it by calculation. No, Your Honor. And I think this is exactly why the deference to the district court is so very heavy in these scenarios, because the district court is the one who can see what a minuscule role they've argued. Actually, the district court said that it was prejudicial. Right? I understand that you have gloss on what you think he meant when he said prejudicial. But he did say prejudicial, right? He did, Your Honor. But I would dispute that uttering the word prejudice has this kind of talismanic significance. It does in the law, actually, especially in the homeless error analysis. It actually does have a talismanic significance. That's exactly what it has. Well, it's prejudicial error that is a legal term of art that has this kind of significance. And we know that the judge, he said, didn't mean that. Improper and prejudicial. Well, improper sounds an awful lot like error and prejudicial. If I say improper and prejudicial, are those not synonyms for prejudicial error? We know that the judge didn't mean prejudicial error in the sense of having affected substantial rights or altered the outcome of the trial, because the judge then goes on to say. Can you agree with me that what he said was it makes this ground for non-infringement erroneous and illegal? You know, that there might be other grounds that the jury could rely on that were not legally erroneous, but at a minimum that the language that's at A111 about improper and prejudicial to Maggie May, at a minimum, makes it so this one ground for non-infringement is legally erroneous. What the district court judge did is two things. No, a yes or a no. Please, just to start so I can follow you. Yes, Your Honor. The judge looked at the substantial rights question in the context of this issue, but it did more than that. It looked at whether this issue affected Maggie May's substantial rights, and then it did the other part of the inquiry that the Fifth Circuit requires in order for the judge to You are in a very broad, discussing this broadly. So I understand what you're saying. You're saying you don't agree that, I think you're saying that you don't agree with my reading of the opinion. The district court's opinion rests on two grounds, and both of them are required for the judge to have been required to grant and retry. I'm going to be brief, okay. The manifest injustice one and the injury to Maggie May's substantial rights. Your view is that the district court, when it said prejudicial, it didn't have to say that alone. It had to go beyond that and say manifest injustice. I think it had to, yes, I think it had to do two steps beyond that. The first one is to see whether the prejudice affected the outcome of the trial, because you have all sorts of cases where the court opines that something caused prejudice to a party, but the prejudice was but slight. Wait, did you have to figure out whether the prejudice caused a different outcome to the trial, or isn't it, actually doesn't the burden actually kind of go the other way? If you look at, can we be sure this did not substantially affect rights? No, Your Honor. All of the cases that my friend cites that set forth that standard with the general verdict and can we know whether it affected the general verdict, those are cases in which the jury has received a legally erroneous instruction from the judge, and that matters because the law recognizes that there's a very different standard when the person in the robe tells the jury a wrong thing about what the law is versus when an attorney merely makes an argument to the jury. Okay, and on that point, I just want to clarify because I want to make sure I heard you correctly. Did you tell Chief Judge Moore that Phillips did not argue that there was no actual testing done and therefore you can find no infringement? You did not make that argument, or did I mishear you? If I said that, I didn't quite mean to say that. There is a single statement in the record after the judge's admonishment to the parties not to make that argument. It appears in the closing argument, a single two-line statement. Okay, hold on a second. I really want to read this to you. Yes, Your Honor. Because this is in the closing, and this is what counsel said, okay? The first two questions are 1 and 2, and this is what counsel said. But folks, you don't get to question 3 or question 4 when you answer no to questions 1 and 2 as to infringement. And you answer no because that's consistent with there's no actual test data that shows compliance.  So the jury could very well have, and that's the question. Oh, how long did the jury deliberate? A day and a half, two days. The jury could have gone in there and said, well, well. And at the end of the day said, no test data, no infringement. And if we were to find that that was improperly argued to the jury, then how is that not prejudicial, harmful, all of the above? Your Honor, first of all, I think even that statement is ambiguous. Because, remember, there were hundreds of flashpoint samples that were actually admitted at trial. And the question whether the jury should credit those flashpoint samples versus Maggie May's Riazi estimates. How does ambiguity help, Phyllis? Because when the judge is looking at the entirety of the trial record and seeing what effect this single statement, which drew no contemporaneous objection at the time, had on the jury, and considering it in the context. Why do you keep saying single statements? It was peppered and sprinkled throughout the entire trial, this test data. I mean, there's pages and pages of it in here, pages 26 to 27 of the brief. And there's all different instances of where Phyllis gets up and talks about actual testing. Your Honor, in total, we're dealing with less than two pages of statements out of over a thousand pages of trial record. And many of the statements actually go to a different issue altogether. And that is whether the jury should credit Maggie May's actual testing samples versus Phyllis's actual testing samples versus Maggie May's estimates. So let's just be clear. They were taken at the wrong place. You made the argument in your opening, correct? Yes. You made the argument in the closing, in fact, the judge told you not to, correct? Correct. And you made it on all three crosses. I can give you the pages. Do you like them? No, Your Honor. I'm familiar with where counsel argued it. So it was sprinkled throughout, I think is fair. I mean, I think she was being kind when she said peppered throughout, because pepper implies a tiny little flake on an otherwise giant roast. And I think it was more like rolled in pepper or marinated in pepper. Like, I don't know. I think she was being very kind, and you fought her on it. I want to move to one more different thing. You keep claiming they didn't object. But on page 111 of the district court's own opinion, he said they objected during trial. That is a fact-finding. He points in the footnote to various places where they objected. Are you telling me he did not find, did he, that they failed to properly preserve this issue or failed to object? Did he make the finding that they failed to object? He, yes, he made a finding.  Show me exactly where, because I'm on page 111 where he says they objected. I'm sorry, Your Honor. All I meant to say is that he didn't comment one way or the other about whether they made a contemporaneous objection, which is what the Fifth Circuit requires. But I don't want the Court to get too hung up on whether they objected or whether they didn't object, because even if they did object, we're still under a clear abuse of discretion standard in a context in which the district court's discretion is at its zenith. The difference between that and a plain error review is minor here, especially when you're dealing with two independent findings, the manifest injustice finding which he made after 50 pages of analysis of the trial as a whole, which Maggie Mae doesn't even challenge here on appeal, and which upholds the verdict irrespective of the first issue presented, and the substantial rights subsidiary question that we're dealing with in the first issue presented. Anything further? Anything further? Okay, thank you, counsel. Thank you. Mr. McDole, you have a couple minutes of rebuttal. Thank you, Your Honors. I'd like to start with the point about waiver. The district court concluded they had made this waiver argument to the district court in post-trial briefs. The district court rejected it. The district court, having sat through the entire trial, said that we had raised the issue, quote, throughout the course of this litigation. That's something that the district court found. With respect to viscosity, I'd like to come back to, I know you had asked about viscosity with respect to merchantability. At the motion to compel hearing, something else, a third inaccurate representation to the court and to us. Phelps counsel, quote, viscosity in the calculation of CCAI involving viscosity are not at issue in this case. What page is that at? That is at appendix page 0327. Was there a switch of counsel or anything? If there's something that I'm missing, as a trial judge, I'm just asking. Because I just get the sense that Maggie Mae was sort of like swimming upstream. Was there? There was not a change of counsel on Phelps' side? There was not a change of counsel that I'm aware of on either side, Your Honor. Then let me ask Phelps' side while looking for the site. Were you objecting continuously? Your Honor, we did not object to particular questions. Because we were surprised by it when it started happening. We knew that they were bringing it in an opening. The cat was out of the bag. At that point, the playing field was set. We had to start trying to get it. And you made the strategic decision whether or not to really, you know, continue to go check and highlight the issue or just hope that the judge found, well, it was just a couple of seconds or minutes or whatever, and hope for that? When it first started happening, Your Honor, as the judge had said, when we had objected, an email went in, we objected to the issue. The court then took it up right before jury selection and said, I'm going to allow it in. But you can raise it to the extent they bring in the evidence. It starts coming in day three. And what do we do? We get up and say, Your Honor, we again reiterate this objection. And we tried to crystallize the issue a little bit more for them. And I think the judge started to understand the issue because he said, you can file for a curative instruction. The next morning, we filed for a curative instruction. And the judge took it up a day later. So after the curative instruction is, they have done this throughout the entire, the cat is out of the bag. They have been making this argument. We are on that point. I think I stepped on Judge Crowell's question. I'm sorry. I'm sorry. You were looking for the sign, as I recall. No? Chair? No. No. You're good? Okay. Anything further, counsel? No. Okay, good. That's great. Thank you. We thank both counsel. It's taken a submission.